# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARBARA JEAN CAMPBELL, | Case No.  1:12-cv-00651-SAB |
| Plaintiff, | ORDER DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL |
| v. | (ECF Nos. 15, 16, 17) |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

## I.

## INTRODUCTION

Plaintiff Barbara Jean Campbell ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability benefits pursuant to the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff suffers from degenerative changes to the spine; mild arthritic and degenerative changes to her knees bilaterally; history of superficial thrombophlebitis in the right leg;

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge.  (See ECF Nos. 5, 10.)

depressive disorder; and polysubstance dependence in reported remission.  For the reasons set forth below, Plaintiff's Social Security appeal shall be denied.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

In the instant action, Plaintiff protectively filed an application for a Title II period of disability and disability benefits and for Title XVI supplemental security income on May 4, 2006. (AR 60-61.)  Plaintiff's application was initially denied on August 22, 2006, and denied upon reconsideration on June 6, 2007.  (AR 100-04, 106-10.)  Plaintiff requested and received a hearing before Administrative Law Judge Christopher Larsen ("the ALJ") on September 2, 2008. (AR 1309-1335.)  On November 13, 2008, the ALJ found that Plaintiff was not disabled.  (AR 85-95.)

Plaintiff sought review of the ALJ's denial of benefits, and on July 31, 2009, the administrative appeals judge sent the case back to the ALJ for determination of Plaintiff's alleged mental disabilities due to new and material evidence. (AR 96–99.) Plaintiff received a second hearing before the ALJ, which took place on April 14, 2010.  (AR 34-59.)  The ALJ held a supplemental hearing on September 17, 2010.  (AR 1297-1308.)  On September 24, 2010, the ALJ found that Plaintiff was not disabled.  (AR 8-22.)  The Appeals Council declined Plaintiff's request for review on March 8, 2012.  (AR 1-3.)

### A.      Relevant September 2, 2008 Hearing Testimony

1.      Testimony of Plaintiff

Plaintiff testified at the September 2, 2008, hearing without an attorney.  (AR 1316-27, 1329-1330.)  Plaintiff testified that she has depression all the time due to pain in her knees, back, and arm and constant headaches.  (AR 1316-17.)  Plaintiff has spells of light headedness that are undiagnosed, and she does not sleep well.  (AR 1317.)   Plaintiff is taking Darvocet, Naproxen, Robaxin, Ativan, Cymbalta, Abilify, cronconsial, and trazodone.  (AR 1318-19.)  Approximately three days a week, Plaintiff spends half the day in bed due to depression or pain.  (AR 1323.)

Plaintiff drives and goes to the grocery store where she packs her own groceries.  (AR 1324.)  Plaintiff gets out three times a week to go to meetings, church or a book study she attends.

2

1  (AR 1324.)  Plaintiff was hospitalized in July 2008 due to overdosing on her medication.  (AR

2  1324-25.)

3      Plaintiff last worked as a machinist or electronics assembler in 2003.   (AR 1327.)

4  Plaintiff ran a lathe, band saw, saws, and did welding until she was transferred to the machine

5  shop.  (AR 1329.)

6      2.    Testimony of Vocational Expert

7      Ms. Najarian, a vocational expert ("VE"), also testified at the hearing.  (AR 1326-34.)

8  Ms. Najarian characterized Plaintiff's prior work as a machine operator, medium, although

9  Plaintiff was performing heavy.  (AR 1330-31.)  The VE was presented with a hypothetical of a

10  individual of Plaintiff's age, education, and work experience, capable of performing work at a

11  light level of exertion, who can occasionally climb, kneel, crouch, and crawl; and can frequently

12  balance and stoop.  The VE opined that this individual could not perform the prior job as a

13  general machine operator, but could perform the job of assembly of circuit boards.  (AR 1331.)

14      A second hypothetical was presented to the VE of an individual of Plaintiff's age,

15  education and work experience, able to lift and carry 20 pounds occasionally and 10 pounds

16  frequently; can stand and walk a total of four hours in an eight hour day, but could sit six hours in

17  an eight hour day; without any other limitations.  (AR 1331-32.)  The VE opined this individual

18  could not perform any of Plaintiff's past work. (AR 1332.)  The VE stated there would be a full

19  range of sedentary, unskilled work that would be available to this individual, including a loader,

20  semiconductor, DOT 726.687-030, 5,406 jobs available in California; document preparer, DOT

21  249.587-018, 8,557 jobs available in California; and telephone quotation clerk, DOT 237.367-

22  046, 12,763 jobs in California.  (AR 1332-33.)

23      A third hypothetical was presented to the VE of an individual of Plaintiff's age, education,

24  and work experience; can lift or carry ten pounds occasionally, and less than ten pounds

25  frequently; can stand and walk less than two hours total in an eight hour day, and sit a total of

26  four to six hours in an eight hour day.  (AR 1333.)  The VE opined that there would be no jobs

27  that this individual would be able to perform.  (AR 1333.)

28  ///

**B.     Relevant April 14, 2010 Hearing Testimony**

1.  <u>Testimony of Plaintiff</u>

Plaintiff testified at the April 14, 2010, hearing with an attorney present.  (AR 37-46.)
Plaintiff is forty-seven years old.  (AR 37.)  She is a high school graduate and attended a couple
years of college, but did not obtain a college degree.  (AR 37.)  Plaintiff was previously employed
in assembly work and as a cashier.  (AR 37.)  Plaintiff was terminated from her last employment
and was told the termination was due to a dirty drug test.  (AR 38.)  Plaintiff states she has been
clean and sober from the use of drugs and alcohol for five years.  (AR 38-39.)

Plaintiff has major depression and does not sleep due to either depression or pain.  (AR
40.)  Plaintiff has been going to Mental Health since May of 2006.  (AR 43.)  There was a brief
period of time when she did not go for treatment.  (AR 43.)  Plaintiff sees Ryan Shurson on a
regular basis.  (AR 40.)  Plaintiff also sees a psychiatrist every week or every other week.  (AR
40.)  Plaintiff takes Cymbalta and trazodone, which help her when she does not forget to take
them, but she still has problems.  (AR 40.)    Plaintiff misses taking her medication about half of
the time.  (AR 56.)  When she does not take her medication she cries and her temper flares.  (AR
47.)

Plaintiff has a driver's license and is on General Relief, receiving food stamps.  (AR 41.)
Plaintiff has difficulty concentrating and is only able to concentrate for fifteen to thirty minutes.
(AR 43.)  Plaintiff forgets what she was doing when she did it.  (AR 43.)

Plaintiff lives with her father.  (AR 44.)  Plaintiff cooks for herself, but has a friend,
Rhonda Rhodes, that helps her with laundry and cleaning the house.  (AR 44-45.)  On a normal
day, Plaintiff gets up in the morning, has coffee and cigarettes, watches television, and cleans up.
(AR 44.)  Sometimes she will lie back down.  (AR 44.)  Plaintiff attends church twice a month.
(AR 45.)

2.  <u>Testimony of Rhonda Rhodes</u>

Rhonda Rhodes testified at the hearing.  (AR 46-52.)  Ms. Rhodes has known Plaintiff
since she was in the fifth grade.  (AR 47.)  Ms. Rhodes goes over to help Plaintiff on a daily basis.
(AR 47.)  Ms. Rhodes is concerned because Plaintiff will stay in bed too long. (AR 48.)  She goes

1  over to get Plaintiff up, make her shower, and get dressed to try to make her have a normal day.

2  (AR 48.)  Ms. Rhodes calls or texts Plaintiff in the morning to make sure that she takes her

3  antidepressants.  (AR 48, 50.)  Ms. Rhodes will try to force Plaintiff to go to church because they

4  feel better after going to church.  (AR 49.)  Ms. Rhodes goes over to help Plaintiff clean and do

5  household chores at least once a week.  (AR 48-49.)

6       Ms. Rhodes has known Plaintiff since they were ten years old.  (AR 50.)  Plaintiff used to

7  be bubbly, but is not anymore.  (AR 50.)  Ms. Rhodes and Plaintiff stopped seeing each other in

8  high school and reunited about four years ago, so she does not know when Plaintiff's personality

9  changed.  (AR 51.)  Ms. Rhodes can tell when Plaintiff has not taken her medication because she

10  is really blue.  (AR 50.)  When Plaintiff takes her medication she is more like the person that Ms.

11  Rhodes knew.  (AR 50-51.)

12       3.    Testimony of Vocational Expert

13       Ms. Cheryl Chandler, a VE, also testified at the hearing.  (AR 52-58.)  Ms. Chandler

14  characterized Plaintiff's prior work as an electronics assembler, SVP 4, semi-skilled and light;

15  machinist, SVP 7, skilled and medium work; and a cashier, SVP 3, semi-skilled and light.  (AR

16  53.)  The VE was asked to opine about the job prospects of an individual with several

17  hypothetical limitations.  First, the VE was asked a hypothetical with the following limitations:

18  • A person the same age, education, and work experience as Plaintiff;

19  • Can perform light physical exertion as defined in the regulations;

20  • Can occasionally climb, kneel, crouch, and crawl;

21  • Can frequently balance and stoop; and

22  • Able to perform simple, repetitive tasks.

23  (AR 53.)

24       The VE opined that because this individual could only perform simple, repetitive tasks,

25  she could not perform any of Plaintiff's past relevant work.  (AR 53-54.)  The VE stated that this

26  individual would be able to work as cashier, DOT 211.462-010; representative, DOT 211.462-

27  010; usher, DOT 344.677-014, with 11,100 jobs available in California; and ticket taker, DOT

28  344.677-010, with 9,300 jobs available in California.  (AR 54.)

1    The VE was given a second hypothetical of a person with the same age, education, and

2  work experience as Plaintiff, who can lift and carry less than ten pounds, stand and walk two

3  hours and sit a total of four hours in an eight hour day.  (AR 54-55.)  The VE opined there would

4  be no jobs that this individual could perform.  (AR 55.)

5    The VE was given a third hypothetical of a person with the same age, education, and work

6  experience as Plaintiff and, regardless of their physical limitations, cannot maintain attention and

7  concentration though an eight hour day or forty hour workweek.  (AR 55.)   The VE opined there

8  would be no jobs available for this individual.  (AR 55.)

9    Plaintiff's counsel then asked the VE whether there would be jobs available for a person

10  with the same age, education, and work experience as Plaintiff who would be absent from work

11  more than three times a month due to impairments or treatment.  (AR 55.)  The VE opined there

12  would be no jobs for this individual.  (AR 55.)

13    **C.**    **Relevant September 17, 2010 Hearing Testimony**

14    The VE, Ms. Cheryl Chandler, testified at the supplemental hearing on September 17,

15  2010.  (AR 1300-07.)  Plaintiff's attorney presented a hypothetical of a person the same age,

16  education, and work experience of Plaintiff; the individual's memory is significantly impaired;

17  she was not able to recall any events after a brief delay; she could not recall being asked to

18  remember three words to complete a task; concentration was mildly impaired; abstract reasoning

19  was fair; basic math calculation was fair; insight was fair; judgment was poor; and she was not

20  able to manage her own funds based upon her past substance abuse history.  The individual's

21  physician thought that she could adequately perform one or two step, simple, and repetitive tasks,

22  but was mildly impaired to perform complex tasks, mildly impaired in her ability to accept

23  instructions from supervisors and interact with co-workers and the public.  (AR 1303.)  She is

24  able to perform activities on a consistent basis without special or additional instructions; has a fair

25  ability to maintain regular attendance in the workplace; is mildly impaired in her ability to

26  complete a normal workday or workweek without interruption from psychiatric conditions; and

27

28

has a Global Assessment of Functioning ("GAF") of 50.[2]  (AR 1303-04.)  Plaintiff's counsel further gave the definition of a GAF of 50, as serious symptoms, e.g. suicidal ideation, ideation severe, obsessional rituals, frequent shoplifting, or any serious impairment in social occupation or school functioning, e.g. no friends, unable to keep a job.  (AR 1305.)

The VE opined that this person could not perform Plaintiff's past relevant work.  (AR 1305.)  The VE stated that the one inconsistency is that the doctor stated the individual could do one and two step simple, repetitive tasks.  (AR 1305.)  Plaintiff's counsel again stated that the definition of GAF 50 is that they are unable to keep a job.  (AR 1305.)  The VE opined that taken collectively the individual would not be able to perform Plaintiff's past relevant work, however the one inconsistency is the one to two step simple, repetitive tasks.  (AR 1306.)

### C.    ALJ Findings

Following the case being sent back for consideration of Plaintiff's mental health disabilities, the ALJ found that Plaintiff has the following severe impairments: degenerative changes to the spine; mild arthritic and degenerative changes to her bilateral knees; history of superficial thrombophlebitis in the right leg; depressive disorder; and polysubstance dependence in reported submission. The ALJ found that none of Plaintiff's impairments, alone or in combination, meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (AR 14.)  Plaintiff has the residual functional capacity, as relevant to this appeal, to perform simple, repetitive tasks.  (AR 15.)  Although Plaintiff cannot perform any past relevant work, her age, education, work experience and residual functional capacity allow her to perform jobs that exist in significant numbers in the national economy.  (AR 21.)  The ALJ found that Plaintiff has not been under a disability from June 15, 2003, through the date of the decision. (AR 22.)

///

///

---

[2] "The Global Assessment of Functioning or 'GAF' scale reflects a clinician's assessment, from 1 to 100, of the individual's overall level of functioning."  Ayala v. Colvin, No. 1:11-cv-01910-SMS, 2013 WL 1164964, at *2 n.3 (E.D. Cal. Mar. 20, 2013).

1

   **D.     Relevant Medical Records**

2      The medical record is summarized here in chronological order with particular regard to

3   the records relevant to Plaintiff's mental impairment claim.  Nonetheless, the record as a whole

4   was reviewed and will be referenced as necessary to the Court's opinion.  (AR 288-1296.)

5      Plaintiff was seen at the San Juan Health Center on May 30, 2006, and indicated that she

6   wanted to see about being authorized for temporary disability.  She was referred to "Psych" for

7   depression and disability issues.  (AR 404.)

8      On July 21, 2006, Plaintiff presented for a comprehensive psychiatric evaluation by Dr.

9   Greg Hirokawa.  (AR 453-458.)  Plaintiff indicated that she was depressed due to her medical

10  problems, not being able to work, financial issues, and losing her daughter to adoption.  (AR

11  453.)  Plaintiff stated she had been receiving treatment for the prior month and a half and it was

12  somewhat helpful.  (AR 452.)  Plaintiff was cooperative throughout the interview.  Her stream of

13  mental activity was within normal limits and thought processes were appropriate.  (AR 455.)

14  Plaintiff's mood appeared to be depressed, she reported poor sleep, and her appetite was fair.

15  (AR 455.)  Plaintiff was oriented times three.  (AR 456.)  Plaintiff was assessed with a current

16  GAF of 65.  (AR 457.)  Plaintiff's symptoms of depression were within the normal range and the

17  likelihood of her mental condition improving within the next twelve months was found to be fair.

18  (AR 457.)  Dr. Hirokawa found that:

19
20
21
22

>   The claimant is capable of managing her funds.  The claimant's ability to remember location and work-like procedures is good.  Her ability to remember and understand very short and simple instructions is good.  The claimant's ability to understand and remember detailed instructions is good.  Her ability to carry out very short and simple instructions is good.  Her ability to maintain attention and concentration for extended periods is good.  Her ability to accept instructions from a supervisor and respond appropriately to criticism is good.  The claimant's social judgment and awareness of socially appropriate behavior is good.

23
24
25
26

>   The claimant's ability to perform activities within a schedule, maintain regular attendance, and be punctual is good.  Her ability to function independently and sustain an ordinary routine without special supervision is good. Her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace is good.

27
28

>   The claimant's ability to interact with coworkers is good.  The claimant's ability to withstand the stress of a routine workday and deal with various changes in the work setting is good.  The likelihood of the claimant emotionally deteriorating in a work environment is minimal.

(AR 457-58.)

On May 10, 2006, Plaintiff was seen by Ryan Shurson, Marriage and Family Therapist Intern ("MFTI.") at Tulare County Mental Health.   (AR 698-701, 721, 1191-94.)   Plaintiff reported difficulty concentrating and forgetfulness for a month prior to the visit.   (AR 695.) Plaintiff reported symptoms of depression: feelings of sadness and hopelessness, feelings of guilt, fatigue, sleep disturbance, and loss of pleasure in nearly all activities that began in 2005 after she was convicted of a drug charge and her daughter was taken and placed in foster care.   (AR 696.) Plaintiff indicated that she was fired from her job three years prior due to her drug use.   (AR 696.) Plaintiff was oriented to person, place, time, and situation and alert and oriented times four.   (AR 698-99.)   Plaintiff's affect was sad and depressed and she expressed guilt regarding her using substances with her eldest daughter.   (AR 699.)   Plaintiff's thought processes were logical and linear.   (AR 699.)   Mr. Shurson noted that her history of substance abuse made it difficult to provide a diagnosis and her anemia might be responsible for the physical symptoms that are typical of depression.   (AR 700.)   Plaintiff was diagnosed with major depressive disorder, single episode, moderate; and amphetamine dependence, sustained partial remission.   (AR 700.)

On June 1, 2006, Plaintiff was seen by Nurse Practitioner Glaze and indicated that she was attempting to get temporary disability due to depression and drug addiction.   (AR 631-32.) Plaintiff was seen by Mr. Shurson on June 15, 2006, and had been experiencing moderate depressive symptoms for two weeks because her eldest daughter revealed that she was pregnant and Plaintiff was angry due to jealousy because Plaintiff had lost custody of her youngest child. (AR 719, 797.)   On June 22, 2006, Plaintiff saw Mr. Shurson and indicated that she was highly stressed and anxious as the next day her daughter's adoption was likely to be finalized.   (AR 718, 796.)   On June 29, 2006, Mr. Shurson noted that Plaintiff had been extremely depressed the prior week when her daughter's adoption was finalized as she was grieving the loss of her daughter. (AR 717, 795.)

On July 6, 2006, Mr. Shurson noted that Plaintiff was experiencing significant depressive symptoms and guilt after losing custody of her youngest daughter due to her substance abuse.

9

(AR 716, 794.)  On July 13, 2006, Plaintiff was seen by Mr. Shurson and appeared depressed and fatigued.  (AR 715, 793.)  On July 20, 2006, Plaintiff was seen by Mr. Shurson and discussed her strained relationship with her eldest daughter.  (AR 714, 792.)  On July 20, 2006, Plaintiff was seen by Mr. Shurson and the major theme of the session was the strained relationship with her eldest daughter, rather than the loss of her youngest child.  (AR 713, 714.)

Plaintiff was seen by Dr. Parayno on July 25, 2006.  She was alert and oriented times three.  Her speech was linear and spontaneous.  Affect was rather blunted and mood appeared depressed.  Plaintiff's cognition in terms of memory, concentration, and attention span appeared adequate.  (AR 791.)  On July 27, 2006, Plaintiff was seen for cryosurgery of the cervix by Nurse Practitioner Glaze.  (AR 627.)  The medical record indicates that Plaintiff has been having episodes that appear to be anxiety attacks. (AR 628.)

On July 31, 2006, Plaintiff stopped to pick up her medication, and Licensed Vocational Nurse Larson noted that Plaintiff stated she was doing well, and eating and sleeping well.  (AR 711, 788.)  On August 3, 2006, Mr. Shurson saw Plaintiff who indicated that she had been feeling less depressed during the previous few days, in part due to her daughter being less abusive to her.  (AR 710, 787.)  Plaintiff was seen by Mr. Shurson on August 10, 2006, and appeared visibly improved.  (AR 709, 786.)  On August 15, 2006, Mr. Shurson spoke with Plaintiff by phone.  (AR 708, 785.)  Mr. Shurson had a phone call with Plaintiff on August 22, 2006, in which she indicated she was stable but experiencing a great deal of stress.  (AR 707, 784.)  On August 24, 2006, Plaintiff saw Mr. Shurson complaining that her severe lethargy and fatigue limit her physical activity and aggravate her depressive symptoms.  (AR 706, 783.)  Plaintiff cancelled an appointment with Mr. Shurson on August 30, 2006, due to health complications.  (AR 705, 782.)

On September 7, 2006, Plaintiff saw Mr. Shurson complaining of feelings of neglect and hopelessness.  (AR 704, 781.)  Plaintiff was seen by Mr. Shurson on September 14, 2006, and reported continued depression due to separation from her youngest child and complications with her oldest daughter.  (AR 703, 780.)  On September 21, 2006, Plaintiff was seen by Mr. Shurson and expressed fear for her daughter's health and a significant amount of guilt for their history of problems.  (AR 702, 779.)  Plaintiff saw Mr. Shurson on September 28, 2006, and indicated that

1   she has a mass on her lung which the doctor thought was cancerous.  Plaintiff was extremely

2   emotional and her mood appeared to be improved after the session.  (AR 778.)

3          Plaintiff was seen by Mr. Shurson on October 5, 2006, and was extremely sad and

4   distraught.   Medications were prescribed and called in for Plaintiff to pick up after the

5   appointment.  (AR 775.)  Plaintiff cancelled an appointment on October 12, 2006, but indicated

6   that although she was still feeling depressed, she was better than the previous week.  Plaintiff had

7   received and began taking her medication and noticed an improvement in her mood two to three

8   days later.  (AR 774.)  Plaintiff saw Mr. Shurson on October 19, 2006, and indicated that her

9   mood had improved since finding out that she does not have cancer.  (AR 773.)

10          On November 1, 2006, Mr. Shurson had a phone call with Plaintiff in which she reported

11   that she was feeling emotionally, mentally, and physically exhausted.  (AR 768.)  Mr. Shurson

12   saw Plaintiff and completed a monthly update on November 2, 2006, in which he indicated that

13   Plaintiff was experiencing feelings of sadness, loneliness and grief and that her depression,

14   anxiety, and panic caused her to isolate herself and withdraw from social situations.  (AR 754,

15   767.)  On November 6, 2006, Plaintiff was seen by Dr. Parayno who indicated that she was using

16   Cymbalta and trazodone which appeared to be helping her.  She was alert and oriented times

17   three.   Her speech was spontaneous, linear and goal directed.   Her affect and mood were

18   appropriately modulated.  She did not appear depressed, anxious, or irritable.  (AR 766.)  Plaintiff

19   was seen by Mr. Shurson on November 9, 2006 and her mood was depressed and agitated due to

20   the stress of moving, having no home to move to, her physical health, and an argument she had

21   with a friend.  (AR 765.)  Mr. Shurson saw Plaintiff on November 22, 2006.  (AR 763.)  Plaintiff

22   was seen by Mr. Shurson on November 30, 2006, and he indicated that her appearance was

23   markedly improved since the prior visit.  (AR 762.)

24          Mr. Shurson called Plaintiff on December 21, 2006 because she missed an appointment.

25   (AR 759.)  Plaintiff saw Mr. Shurson on January 4, 2007 and indicated that she saw positive

26   changes between herself and her daughter.  (AR 758.)  Plaintiff saw Mr. Shurson on January 11,

27   2007, and was experiencing fatigue and difficulty with task completion as she was moving into a

28

1    trailer with her father.  (AR 756.)  Plaintiff was seen by Mr. Shurson on January 18, 2007, who

2    noted her mood was stable and less depressed than the previous week.  (AR 755.)

3        Plaintiff did not show for an appointment on February 1, 2007.  (AR 1190.)  Plaintiff

4    cancelled an appointment on February 7, 2007, because her father was having health problems.

5    (AR 1188.)  Plaintiff appeared on February 15, 2007, and expressed sadness and concern to Mr.

6    Shurson because her father was non-responsive and connected to a respirator in the Intensive

7    Care Unit.  (AR 1187.)

8        On March 1, 2007, Plaintiff saw Mr. Shurson who noted that her mood was noticeably

9    improved compared to the previous session.  (AR 1185.)  Plaintiff saw Mr. Shurson on March 8,

10   2007, and he noted that her mood was stable and much improved since she is taking her

11   medication more consistently.  (AR 1184.)  On March 14, 2007, Plaintiff was seen by Dr.

12   Parayno.  Plaintiff stated that her medications had been helpful.  Plaintiff was alert and oriented

13   times three.  Her speech was spontaneous, linear and goal directed.  Mood and affect were

14   appropriately modulated.  Plaintiff did not appear depressed, irritable or anxious.  Cognition in

15   terms of memory and concentration were adequate and judgment and insight were fair.  (AR

16   1183.)  Plaintiff saw Mr. Shurson on March 15, 2007, and he reported that she had an improved

17   mood. (AR 1182.)  Plaintiff cancelled an appointment for March 29, 2007.  (AR 1181.)

18       Plaintiff saw Mr. Shurson on April 12, 2007 and appeared depressed and fatigued.

19   Plaintiff reported that her father was living at home and she was assisting in his recovery and

20   rehabilitation.  (AR 1180.)  On April 19, 2007, Plaintiff saw Mr. Shurson.  Plaintiff stated that she

21   was depressed and having feelings of anger, frustration, guilt and shame.  Plaintiff's BDI score

22   was 22.  (AR 1179.)

23       Mr. Shurson called Plaintiff to reschedule an appointment and noted that she reported that

24   she was doing well and sounded in good spirits.  (AR 1178.)  Plaintiff did not show for an

25   appointment on May 3, 2007.  (AR 1177.)  On May 10, 2007, Plaintiff saw Mr. Shurson who

26   indicated that her mood was stable.  (AR 1176.)  Plaintiff picked up medications on May 14,

27   2007, and stated that she was doing well and was taking all her medication as prescribed.  (AR

28   1175.)  Dr. Parayno saw Plaintiff on May 16, 2007.  Plaintiff reported that her medications had

been very helpful.  Plaintiff stated that, by and large, she is doing quite well on her medications.  Plaintiff was alert and oriented three times.  Her demeanor was pleasant and calm.  Plaintiff's affect was appropriate to content and her mood was bright and animated.  Cognition in terms of memory, concentration and attention was adequate, and judgment and insight were good.  (AR 1173.)  Plaintiff presented on May 24, 2007, with an elevated mood.  Plaintiff appeared to have more energy than normal, moved more freely, and was experiencing less pain.  (AR 1172.)  Mr. Shurson saw Plaintiff on May 31, 2007, and noted that she was in a stable mood.  Plaintiff's affect was somewhat disconnected and she had difficulty identifying and connecting to her feelings.  (AR 1171.)

On June 6, 2007, Plaintiff did not show for her appointment.  (AR 1170.)  On June 27, 2007, Plaintiff cancelled an appointment due to the death of her grandmother.  (AR 1169.)

Plaintiff was seen by Licensed Marriage and Family Therapist ("LMFT") Hochhalter on July 5, 2007, and reported that she was having a good day; however, she had both good and bad days on a regular basis.  (AR 1168.)  Dr. Parayno saw Plaintiff on July 18, 2007.  Plaintiff reported that her medications had been effective for treating her depression.  Plaintiff was alert and oriented times three.  Her affect was congruent to the thought content and her mood was euthymic.[3]  Cognition was adequate in terms of memory, concentration, and attention span.  Plaintiff's judgment and insight were good.  (AR 1165.)  Plaintiff was seen by Mr. Hochhalter on the same date who noted that she presented depressed and became tearful almost immediately.  (AR 1167.)

Plaintiff was seen by Mr. Hochhalter on August 3, 2007.  (AR 1164.)  Plaintiff was seen on August 10, 2007, by Dr. Cadiz-Vea.  (AR 1160-62.)  Plaintiff was alert and oriented to all spheres.  She appeared to be enjoying her life and was determined to remain clean and sober.  Plaintiff was taking Cymbalta and trazodone with good response.  (AR 1161.)  Mr. Hochhalter noted that Plaintiff presented mildly depressed on August 15, 2007, and was having nightmares.

---

[3] [3] According to the medical dictionary, euthymic is defined as "pertaining to a normal mood in which the range of emotions is neither depressed nor highly elevated."  Mosby's Medical Dictionary (8th Ed. 2009) available at http://medical-dictionary.thefreedictionary.com/euthymic (last visited August 22, 2013).

1    Mr. Hochhalter noted that Plaintiff was processing the death of her grandmother and ailing health

2    of her father.  He helped Plaintiff understand her nightmares in the context of fear that she would

3    lose complete contact with her daughter who had been adopted by another family.  (AR 1159.)

4    Plaintiff was seen by Mr. Hochhalter on August 30, 2007, and indicated that her focus the prior

5    week had been on her back pain.  Plaintiff also discussed her frustration with her father and his

6    current choice of a girlfriend.  (AR 1157.)

7        Plaintiff was seen by Mr. Hochhalter on September 7, 2007, and stated that she was doing

8    well and coping with the loss of her grandmother.  (AR 1156.)

9        Mr. Hochhalter saw Plaintiff on October 9, 2007, to review and update her plan.  (AR

10   1153.)  Plaintiff saw Mr. Hochhalter on October 23, 2007, and indicated that she was willing to

11   participate in group therapy.  (AR 1152.)

12       On November 20, 2007, Plaintiff was seen by Dr. Cadiz-Vea and stated that emotionally

13   she was doing a lot better.  Plaintiff's mood was a little bit depressed.  Affect was appropriate.

14   Plaintiff's appetite and sleep were fair.  (AR 1151.)  Plaintiff also attended the first week of group

15   and participated well.  (AR 1149.)  Mr. Hochhalter noted that Plaintiff presented well at group on

16   November 27, 2007.  (AR 1148.)  Plaintiff did not attend group on December 4, 2011.  (AR

17   1147.)  Plaintiff attended group therapy on December 11, 2007, and Mr. Hochhalter noted that

18   she was doing well and making good progress toward her goals.  Plaintiff was having mild

19   emotional difficultly during the Christmas season.  (AR 1146.)

20       Plaintiff saw Mr. Hochhalter on March 11, 2008, who noted that she was moderately

21   depressed and was unable to pursue employment due to recurring pain.  However, Plaintiff was

22   assisting with caring for her father at home and was a Narcotics Anonymous sponsor.  (AR 1145.)

23   On March 25, 2008, Plaintiff was seen by Mr. Hochhalter who noted that she had increased

24   depression due to a recent visit with her daughter who had been adopted.  (AR 1144.)  Plaintiff

25   saw Mr. Hochhalter on April 8, 2008, who encouraged Plaintiff to return to group therapy.  (AR

26   1143.)

27       On May 28, 2008, Mr. Hochhalter called Plaintiff to inform her of a new group that was

28   beginning.  Plaintiff indicated that she was struggling a little more with depression due to her

14

chronic back pain.  (AR 1141.)  On June 3, 2008, Plaintiff attended group therapy led by Mr. Hochhalter and presented well.  (AR 1140.)  Plaintiff did not attend group on June 17, 2008, or July 1, 2008.  (AR 1139.)  On July 1, 2008, Plaintiff's refill request was denied because it was too long between her doctor appointments.  (AR 1136.)

On July 9, 2008, Plaintiff was taken to Kaweah Delta Medical Center due to an accidental medication overdose.  (AR 1095, 1097-1113.)  Dr. Lopez examined Plaintiff on July 9, 2008. Plaintiff had not been taking her psychiatric medication for the past two months.  Without her medications she became agitated, depressed, paranoid, and heard voices.  Plaintiff's speech was coherent and her affect flat.  Plaintiff was anxious, sad, and depressed.  Her attention and concentration were grossly intact, although she claimed to have poor concentration and inability to focus due to agitation.  Plaintiff admitted to some depression and anxiety, and denied suicidal thoughts, although she stated that she sometimes thinks about putting a gun to her head.  Plaintiff stated she was having mood swings and was unable to sleep, although she was okay when she was taking her medication.  Dr. Lopez found that without her medication, Plaintiff tends to decompensate.  (AR 1134.)  On the same date, Mr. Hochhalter met with Plaintiff who indicted that she had been out of her medication for over three weeks.  Plaintiff discussed the stressors in her life; problems with her father and his girlfriend, and sadness over the adoption of her daughter.  Mr. Hochhalter explained to Plaintiff that her current symptoms were most likely directly linked to the lack of medication.  (AR 1135.)

Plaintiff saw Mr. Hochhalter on July 15, 2008, who noted improvement in mood and affect.  Plaintiff reported that she had restarted her medication on July 11, 2008, and was feeling back to normal.  Plaintiff met the criteria for medical necessity as evidenced by how she functions with medication versus without medication.  (AR 1133.)  Plaintiff was seen by Mr. Hochhalter on September 3, 2008, and reported she was taking her medications and communicated no problems. (AR 1132.)

Plaintiff was assessed by Dr. Lopez on October 15, 2008.  She was doing very well with her medication.  Plaintiff was oriented to time, place, and person.  Her speech was coherent and a normal rate.  Affect was appropriate and mood was neutral.  Plaintiff denied any significant

anxiety or depression.  Her sleep and appetite were good and she was able to perform her routine daily activities.  Plaintiff was able to drive and attend to her daily needs.  Her attention and concentration were grossly intact and her insight and judgment were fair.  (AR 1130.)

Mr. Hochhalter saw Plaintiff on November 12, 2008, and she appeared depressed and tearful.  Plaintiff denied suicidal ideations, but continued to meet the criteria for medical necessity due to her level of depression.  The current increase in her depression was stated to be due to feelings of guilt because she was moving from her father's residence.  (AR 1128.)  On December 2, 2008, Mr. Hochhalter met with Plaintiff who presented with an improved mood and affect.  (AR 1126.)  On December 16, 2008, Plaintiff was seen for a termination session by Mr. Hochhalter and indicated that she was not feeling as depressed and was taking her medications as prescribed.  (AR 1123.)

Plaintiff was seen by Dr. Crisanto on August 12, 2009 indicating that she was experiencing significant depression since discontinuing her treatment in January.  Plaintiff stated she had difficulty sleeping; frequent tearfulness, stayed in bed all day twice a week, rarely left her house, and received no pleasure from enjoyable activities.  Plaintiff was fully oriented and aware, and was tearful throughout the interview.  (AR 1229.)  Plaintiff saw LMFT Shurson[4] on August 13, 2009.  (AR 1226.)   Plaintiff indicated that she had not been taking her previously prescribed medications.  Mr. Shurson stated that Plaintiff met medical necessity due to impairment resulting from her symptoms and the likelihood that her condition will deteriorate if left untreated.  (AR 1227.)  He completed a Wellness Plan for Plaintiff.  (AR 1228.)

On August 25, 2009, Mr. Shurson completed an Initial Strength/Needs Assessment for Plaintiff.  (AR 1230-34.)  Plaintiff indicated that she stopped receiving treatment in January 2009 because the therapist felt she had improved, however, Mr. Shurson noted that the record showed Plaintiff was discharged after failing to return for services.  (AR 1230.)  Plaintiff was fully oriented and aware during the visit.  Plaintiff was estimated to be functioning in the average intelligence range.  Plaintiff was found to be extremely resilient, intelligent, and motivated to

---

[4] The Court notes that it appears that during this time period Mr. Shurson became licensed as Marriage and Family Therapist and returned to the clinic.

1  participate in treatment.  (AR 1231.)  Plaintiff was terminated from her last employment due to

2  poor performance due to drug use.  (AR 1232.)  Plaintiff's GAF was 45.  Mr. Shurson found that

3  Plaintiff's symptoms were unlikely to improve without mental health intervention.  (AR 1233.)

4  Plaintiff was seen by Dr. Villa on August 27, 2009.  Plaintiff stated that she came back

5  because her sadness, anhedonia, difficulty functioning and concentrating, fatigue, lack of appetite,

6  insomnia, and passive suicidal ideation had returned.  Plaintiff indicated that she wanted to restart

7  therapy and medication.  Plaintiff's speech was normal rate, rhythm, and volume.  Her mood was

8  sad and affect constricted.  Thought process was logical and directed.  Impulse control was good

9  and insight and judgment were fair.  Plaintiff was restarted on Cymbalta and trazodone.  (AR

10  1223.)  Plaintiff also saw Mr. Shurson on this date who noted that she was extremely emotional

11  and tearful during the appointment.  Plaintiff stated she was experiencing sleep disturbance, loss

12  of appetite, diminished pleasure, low motivation, and recurrent and intrusive recollections of past

13  trauma.  (AR 1225.)

14  On September 10, 2009, Plaintiff was seen by Mr. Shurson and reported fatigue, low

15  motivation, diminished pleasure, sleep disturbance, sad mood and apathy.  Plaintiff stated she had

16  been more isolative during the prior two weeks and her physical complaints had worsened.  (AR

17  1221.)  Plaintiff was seen by Mr. Shurson on September 24, 2009, and reported that her major

18  source of stress was the burden she feels regarding her daughter's dysfunctional relationship.

19  (AR 1220.)

20  Plaintiff was seen by Mr. Shurson on October 8, 2009, and had been told by her doctor

21  that the mass in her lung would become cancerous if she did not stop smoking.  Plaintiff was

22  fearful regarding her inability to quit smoking.  (AR 1219.)  On October 13, 2009, Plaintiff was

23  seen by Dr. Villa who found Plaintiff's speech was normal in rate, rhythm and volume.  Her

24  mood was fine and affect was euthymic.  Plaintiff's thought process was logical and goal

25  directed.  Impulse control was fair and insight and judgment were good.  (AR 1217.)

26  On November 12, 2009, Plaintiff was seen by Mr. Shurson.  Mr. Shurson determined that

27  Plaintiff was moderately depressed although she reported that she was stable.  (AR 1215.)

28  Plaintiff was seen by Mr. Shurson on November 25, 2009, and she endorsed suicidal ideation, but

1   denied plan or intent.  Plaintiff indicated that she was under a great deal of stress because of

2   conflict with her daughter's significant other and threats that he would sever her contact with her

3   grandchild.  (AR 1213.)

4        On December 1, 2009, Plaintiff was seen by Mr. Shurson.  Plaintiff's decline in mood was

5   attributed to her spending a day at the hospital due to a severe infection and the resulting pain.

6   (AR 1212.)  Plaintiff was seen by Dr. Villa for an emergency appointment on December 10,

7   2009, because she was feeling very depressed and suicidal after a confrontation with her son-in-

8   law.  Plaintiff's medication was increased and she stated that she was doing a lot better.  Plaintiff

9   denied depressive symptoms, anhedonia,[5] ideas of hopelessness, helplessness, worthless, or

10   suicidal ideation.  Plaintiff was smiling and there was no evidence of psychomotor agitation or

11   retardation.  Plaintiff's impulse control was good.  Judgment and insight were fair.  Plaintiff

12   appeared to be doing better on the current dose of medication.  (AR 1278.)

13        Plaintiff saw Dr. Cabralles on December 21, 2009, for superficial thrombophlebitis and

14   complained of anxiety.  Plaintiff was started on Buscar and advised to return in one week.  (AR

15   1296.)  On December 22, 2009, Mr. Shurson saw Plaintiff and completed a Mental Impairment

16   Questionnaire.  (AR 1243-46, 1277.)  Mr. Shurson assessed Plaintiff with a current GAF of 45,

17   with the highest GAF in the prior year of 47. Plaintiff's symptoms were poor memory, sleep and

18   mood disturbance, anhedonia, psychomotor agitation, feelings of guilt or worthlessness, difficulty

19   thinking or concentrating, suicidal ideation, social withdrawal or isolation, decreased energy,

20   intrusive recollections of a traumatic experience, and hostility or irritability.  (AR 1243.)   Mr.

21   Shurson stated that Plaintiff had severe cognitive deficits and psychomotor retardation,

22   forgetfulness, difficulty concentrating, and fatigued easily.  He found that Plaintiff was not a

23   malingerer.  Plaintiff's symptoms were found to be consistent with severe depressive disorder and

24   post-traumatic stress disorder.  Plaintiff was found to be highly compliant with treatment and her

25   medical issues limited the effectiveness of mental health interventions.  (AR 1244.)  Mr. Shurson

26   found that Plaintiff would be absent from work more than three times per month due to her

27

28

---

[5] "Absence of pleasure from the performance of acts that would ordinarily be pleasurable."  Stedman's Medical Dictionary 92 (28th Ed. 2006)

1  impairments or treatment and her physical limitations and depressive condition limit her work

2  ability.  (AR 1245.)  Mr. Shurson found that Plaintiff's restriction of activities of daily living were

3  moderate; difficulties in maintaining social functioning were mild; difficulties in maintaining

4  concentration, persistence or pace were marked; and Plaintiff had suffered 4 or more repeated

5  episodes of decompensation each of extended duration.  (AR 1246.)

6       On the same date, Mr. Shurson also completed a mental residual functional capacity

7  assessment.  Plaintiff was found to not be significantly limited in her ability to understand and

8  remember very short and simple instructions, ability to carry out very short and simple

9  instructions, and ability to maintain socially appropriate behavior and to adhere to basic standards

10 of neatness and cleanliness.  (AR 1248-49.)  Mr. Shurson found that Plaintiff was moderately

11 limited in her ability to remember locations and work-like procedures; ability to understand and

12 remember detailed instructions; ability to carry out detailed instructions; ability to perform

13 activities within a schedule, maintain regular attendance, and be punctual within customary

14 tolerances; ability to sustain an ordinary routine without special supervision; ability to work in

15 coordination with or proximity to others without being distracted by them; ability to make simple

16 work-related decisions; ability to interact appropriately with the general public; ability to ask

17 simple questions or request assistance; ability to accept instructions and respond appropriately to

18 criticism from supervisors; ability to get along with co-workers or peers without distracting them

19 or exhibiting behavioral extremes; ability to respond appropriately to changes in the work setting;

20 ability to be aware of normal hazards and take appropriate precautions; and ability to set realistic

21 goals or make plans independently of others.  (AR 1248-49.)  He found that Plaintiff was

22 markedly limited in her ability to maintain attention and concentration for extended periods,

23 ability to complete a normal workday and workweek without interruptions from psychologically

24 based symptoms and to perform at a consistent pace without an unreasonable number and length

25 of rest periods, and ability to travel in unfamiliar places or use public transportation.  (AR 1248-

26 49.)

27

28

1   Plaintiff saw Mr. Shurson on January 5, 2010, and stated her chronic pain, financial

2   instability, inability to get medical treatment, and failure to quit smoking aggravate her

3   depression. (AR 1276.) Plaintiff cancelled her appointment on January 25, 2010. (AR 1275.)

4   On February 10, 2010, Plaintiff was seen by Dr. Villa and stated that her mood is more

5   stable with her current medication. Plaintiff claimed that she was having difficulty sleeping due

6   to pain which was causing irritability. Plaintiff's speech was normal. Mood was fine and affect

7   was euthymic. Thought process was logical, and goal directed. Impulse control, judgment and

8   insight were good. (AR 1271.) Mr. Shurson completed a Consumer Wellness Plan on this same

9   date. (AR 1273, 1274.) Plaintiff cancelled an appointment on February 24, 2010. (AR 1270.)

10   Mr. Shurson saw Plaintiff on May 6, 2010, and Plaintiff stated that she had experienced

11   high levels of stress due to a friendship that had led to an increase in her depressed mood.

12   Plaintiff had begun using alcohol and was arrested for driving under the influence. (AR 1268.)

13   Dr. Aleshire preformed a comprehensive psychiatric evaluation on Plaintiff on May 16,

14   2010. (AR 1252-57.) During the examination, Plaintiff interacted appropriately with Dr.

15   Aleshire and his staff and her behavior was appropriate. (AR 1252.) Plaintiff reported having a

16   recent conviction for driving under the influence and two prior convictions for forgery. Plaintiff

17   reported that for the past few months she had been drinking almost every day. She was not aware

18   of how much she was drinking, but stated that she "got drunk." Plaintiff was currently

19   participating in alcohol treatment classes as a condition of her probation. (AR 1254.)

20   Plaintiff claimed to struggle to complete normal daily activities such as showering,

21   cleaning, washing dishes or clothing, or preparing meals. Plaintiff was able to prepare simple

22   meals and go to the grocery store. Plaintiff was vague about most of her daily activities, stating

23   she did not go many places. (AR 1254.)

24   Plaintiff had some difficulties with pace during the interview, but was able to be

25   redirected. Plaintiff's attitude was guarded and she displayed shaking of both her hands and her

26   neck. (AR 1254.) Plaintiff's speech was within normal limits and her thought content was linear

27   and logical. Plaintiff displayed a constricted range of affect and generally presented as

28   despondent and tearful. Plaintiff was alert and fully oriented. Plaintiff's memory was

significantly impaired.  Intelligence was intact, but her fund of knowledge was significantly impaired. Plaintiff's ability to perform basic math calculations was fair.  Attention was mildly impaired, and concentration was fair.  She was able to complete a three-step, simple task. Plaintiff's abstract reasoning was fair.  Insight was fair and judgment was poor.  (AR 1255.) Plaintiff was found to have a GAF of 50.  Plaintiff's functional level due to mental health functioning was moderately impaired.  Plaintiff's condition was found not to expect to abate within the next twelve months given the chronic nature of her condition, currently level of mental health functioning, and available mental health resources.  (AR 1256.)

Plaintiff was seen by Mr. Shurson on May 20, 2010 who noted that Plaintiff remained intensely depressed and her functioning remained poor, but also stated that her mood was considerably improved compared to her previous session.  (AR 1266.)

On June 3, 2010, Plaintiff was seen by Mr. Shurson who indicated that Plaintiff's mood and behaviors had improved significantly during the past few weeks.  (AR 1265.)  Plaintiff failed to show for an appointment with Dr. Villa on June 15, 2010.  (AR 1264.)  Plaintiff was seen by Mr. Shurson on June 17, 2010.  (AR 1263.)  Plaintiff presented to Dr. Villa on July 1, 2010, and stated that she was doing much better on her medication and was no longer anxious and did not have any depressive symptoms. Plaintiff's mood was fine and her affect was euthymic.  Impulse control was better and judgment and insight were good.  Plaintiff was doing well and was to continue to attend therapy.  (AR 1260.)  Plaintiff also saw Mr. Shurson on this same date who noted that her mood was considerably less depressed and she demonstrated a healthy level of entitlement.  (AR 1262.)

On July 22, 2010, Plaintiff failed to show for an appointment.  (AR 1259.)

### III.

### LEGAL STANDARDS FOR JUDICIAL REVIEW OF
### SOCIAL SECURITY DETERMINATIONS

An individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits.  42 U.S.C. § 405(g).  The Court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be

1   disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v.

2   Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012).   "Substantial evidence" means more than a scintilla,

3   but less than a preponderance.   Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal

4   quotations and citations omitted).   "Substantial evidence is 'such relevant evidence as a

5   reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting Richardson v.

6   Perales, 402 U.S. 389, 401 (1971)).   "[A] reviewing court must consider the entire record as a

7   whole and may not affirm simply by isolating a specific quantum of supporting evidence." Hill,

8   698 F.3d at 1159 (quoting Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)).

9   However, it is not this Court's function to second guess the ALJ's conclusions and substitute the

10  Court's judgment for the ALJ's.   See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)

11  ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's

12  conclusion that must be upheld.")

**IV.**

**DISCUSSION AND ANALYSIS**

15      Plaintiff raises three arguments in her opening brief: 1) the ALJ erred in failing to adopt

16  the opinion of the treating source, Ryan Shurson, LMFT at Mental Health; 2) the ALJ erred in

17  failing to accept and adopt the VE testimony in Dr. Aleshire's assessment; and 3) the ALJ erred

18  in failing to find the claimant credible.   (Appellant's Opening Brief 12, ECF No. 15.)

19  Accordingly, only the second decision denying Plaintiff's claim based upon her mental health

20  issues is at issue in this appeal.

**A.     Whether the ALJ Erred in Failing to Adopt Opinion of Treating Source**

22      Plaintiff argues that the ALJ should have adopted the assessment of Mr. Shurson, even

23  though he is not an "acceptable treating source."   Plaintiff contends that since Mr. Shurson is a

24  mental health specialist and treated Plaintiff from 2006 to 2007 and again from 2009 through

25  2010, his opinion should have been given "great weight."   (ECF No. 15 at 12-14.)   Defendant

26  responds that since Mr. Shurson is not a "treating source" or "acceptable medical source" his

27  opinion cannot be given controlling weight.   (Def.'s Opp'n to Pl.'s Opening Br. 9, ECF No. 16.)

28      "In order, to reject the testimony of a medically acceptable treating source, the ALJ must

provide specific, legitimate reasons based on substantial evidence in the record." Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012).  A LMFT is not an acceptable medical source under the Social Security regulations, 20 C.F.R. §§ 404.1502, 404.1513, and is defined as "other sources," 20 C.F.R. 404.1513(d); 20 C.F.R. 416.913(d).  Therefore, the opinions of a LMFT are not entitled to the same deference as an acceptable medical source. See 20 C.F.R. 404.1524.  In order to discount the testimony of a LMFT, the ALJ only needs to provide reasons that are germane to the witness. Molina, 674 F.3d at 1111.

The ALJ gave Mr. Shurson's opinion little weight because he did not see Plaintiff from May 2007, until January 2009; Plaintiff went without treatment from January 2009 until June 2010; and his opinion is not supported by his own treatment records.  Mr. Shurson treated Plaintiff as an intern from May 10, 2006, through May 31, 2007.  After Mr. Shurson left, Plaintiff was treated by Mr. Hochhalter from July 5, 2007 through December 16, 2008.  At the termination visit on December 16, 2008, Mr. Hochhalter noted that Plaintiff was doing well and was to continue with case management services with Deborah Parham and transfer to the services of her primary care provider.  (AR 1123, 1125.)  A discharge summary was completed on January 20, 2009, by Ms. Parham.  (AR 1122.)  Plaintiff went for over eight months without any record of mental health treatment until she returned in August 2009, when she was again treated by Mr. Shurson, who was now a LMFT.  The first two reasons the ALJ gave for giving weight to the opinion of Mr. Shurson, the period of his treatment of Plaintiff and her break in treatment, are clearly supported in the record.

In his assessment, Mr. Shurson found that Plaintiff was highly compliant; however, the record does not support this finding.  The record shows that Plaintiff was not compliant in taking in her medication.  On March 8, 2007, Mr. Shurson noted that Plaintiff's mood was stable and much improved since she was taking her medication more consistently.  (AR 1184.)  On July 5, 2007, Plaintiff told Mr. Hochhalter that she had both good and bad days on a regular basis.  (AR 1168.)   Plaintiff did not take her medication for several months and when Dr. Lopez examined Plaintiff on July 9, 2008, Dr. Lopez noted that when Plaintiff does not take her medications she becomes agitated, depressed, paranoid, and hears voices.  Dr. Lopez found that without her

medication, Plaintiff tends to decompensate.  (AR 1134.)  On the same date, Mr. Hochhalter explained to Plaintiff that her current symptoms were most likely directly linked to the lack of medication. (AR 1135.)  When Plaintiff saw Mr. Hochhalter on July 15, 2008, she reported that she had restarted her medication on July 11, 2008, and was feeling back to normal.   Mr. Hochhalter found that Plaintiff met the criteria for medical necessity as evidenced by how she functions with medication versus without medication.  (AR 1133.)

When Plaintiff saw Mr. Shurson on August 13, 2009, she indicated that she had not been taking her previously prescribed medications.   Mr. Shurson stated that Plaintiff met medical necessity due to impairment resulting from her symptoms and the likelihood that her condition will deteriorate if left untreated. (AR 1227.)   During the April 14, 2010 hearing, Plaintiff testified that she misses taking her medication about half of the time.  (AR 56.)  The record demonstrates that Plaintiff was not compliant, much less highly compliant, in taking her medication as prescribed.

Further, the record shows that Plaintiff was not compliant in attending her medical appointments.   On December 21, 2006, Mr. Shurson called Plaintiff because she missed an appointment.  (AR 759.)  Plaintiff did not show for an appointment on February 1, 2007.  (AR 1190.)  Plaintiff cancelled an appointment on February 7, 2007.  (AR 1188.) Plaintiff did not show for appointments on May 3, 2007, and June 6, 2007.  (AR 1177, 1170.)  Plaintiff did not attend group on June 17, 2008, or July 1, 2008.  (AR 1139.)  On July 1, 2008, Plaintiff's refill request was denied because it was too long between her doctor appointments.  (AR 1136.)  On August 25, 2009, Mr. Shurson completed an Initial Strength/Needs Assessment for Plaintiff and noted that the record showed Plaintiff was discharged in January 2009 after failing to return for services.  (AR 1230.)  Plaintiff cancelled her appointments on January 25, 2010, and February 24, 2010.  (AR 1275, 1270.)   On June 15, 2010, and July 22, 2010, Plaintiff failed to show for appointments.  (AR 1259, 1264.)

The record clearly shows that Plaintiff had significant improvement in her mental health as she was in the process of being transferred from mental health to be followed by her primary care provider in December 2008.  Plaintiff's mental health then declined due to her failure to

1    pursue treatment from December 2008 until August 2009.  On October 13, 2009, Dr. Villa noted

2    that Plaintiff stated her mood was stable, and while she sometimes gets depressed when thinking

3    about the past, she is able to handle those situations.  (AR 1217.)

4         On December 10, 2009, Plaintiff stated that she was doing much better and denied any

5    symptoms of depression.  (AR 1278.)  On February 1, 2010, Plaintiff reported that her mood was

6    stable.  (AR 1271.)  On May 20, 2010, Mr. Shurson noted that Plaintiff's mood was considerably

7    improved compared to her previous session.  (AR 1266.)  On June 3, 2010, Mr. Shurson noted

8    that Plaintiff's mood and behaviors had improved significantly in the past few weeks.  (AR 1265.)

9    On June 16, 2010, Plaintiff reported progress in nearly all of her close relationships and was able

10   to manage her cognitive distortions and co-dependency habits.  (AR 1263.)  On July 1, 2010,

11   Plaintiff reported no depressive symptoms.  (AR 1260.)  On this same date, Mr. Shurson noted

12   that Plaintiff's mood was considerably less depressed and she demonstrated a healthy level of

13   entitlement.  (AR 1262.)

14        The Court finds that the reasons given by the ALJ to discount the opinion of Mr. Shurson

15   are germane as to him and are supported by substantial evidence in the record.  Molina, 674 F.3d

16   at 1111.  The ALJ did not err in giving little weight to the opinion of Mr. Shurson as it is not

17   supported by the treatment records and it conflicts with the opinion of Dr. Aleshire.

18        **B.      Whether the ALJ Erred in Failing to Adopt the VE Testimony Regarding Dr.**
19              **Aleshire's Assessment**

20        Plaintiff claims that the ALJ erred by failing to find that no work existed for Plaintiff

21   based upon the finding that she had a GAF of 50 and the limitations set forth by Dr. Aleshire.

22   The VE opined during the hearing that with the GAF score and limitations set forth Plaintiff

23   would be unable to perform her past work or any other work.   (ECF No. 15 at 15-16.)  Defendant

24   argues that the ALJ did not err in finding that Dr. Aleshire's specific conclusion that Plaintiff

25   could perform simple repetitive tasks outweighed a general statement to the contrary and where

26   there is ambiguity in the evidence the ALJ's findings are entitled to deference.  (ECF No. 16 at 9-

27   10.)  The VE noted the inconsistency between Plaintiff's definition of an individual with a GAF

28   of 50 and Dr. Aleshire's opinion that Plaintiff could perform simple, repetitive tasks.  Defendant

contends that the ALJ is not required to rely upon GAF scores; and Dr. Aleshire's opinion supports the finding that Plaintiff was not disabled by her mental limitations.  (Id. at 10.)  Finally, Defendant argues that the ALJ is not required to give weight to what amounts to a medical assessment by the VE.  (Id. at 11.)

Dr. Aleshire performed a comprehensive psychiatric evaluation and set out his functional assessment of Plaintiff.  Dr. Aleshire found that:

> Given the assessment diagnosis, the claimant currently is not capable of managing her own funds due to the claimant's substance abuse history.  She may benefit from a protective payee.

> The claimant is able to adequately perform one or two-step simple and repetitive tasks.  The claimant has a mildly impaired ability to perform complex tasks as evidenced by her performance on mental status items.

> The claimant has a mildly impaired ability to accept instructions from supervisors and interact with coworkers and the public as evidenced by behavior in the interview and reported difficulties.

> The claimant is able to perform work activities on a consistent basis without special or additional instruction.

> The claimant has a fair ability to maintain regular attendance in the workplace.

> The claimant has a mildly impaired ability to complete a normal workday or workweek without interruptions from a psychiatric condition as evidenced by her behavior during the interview and from self-report.

> The claimant is able to deal with the usual stressors encountered in a competitive workplace.

(AR 1256-57.)

A hypothetical question posed to a VE must set out all or the claimant's limitations and restrictions.  Magallanes v. Bowen, 881 F.2d 747, 756 (9th Cir. 1989).  The ALJ gave great weight to Dr. Aleshire's opinion because it is supported by his findings on mental status examination and recent treatment records.  (AR 17.)  Some weight was given to the opinion of consultative examiner, Dr. Hirokawa; however, the ALJ found that Plaintiff was limited to performing simple, repetitive tasks.  (AR 19.)  The ALJ gave little weight to the state agency psychological consultants and found that Plaintiff's mental impairments are severe and she is limited to unskilled work.  (AR 19.)

1    Dr. Aleshire only found one restriction due to Plaintiff's mental impairments.  He found

2    that Plaintiff was adequately able to perform one or two-step simple and repetitive tasks.  (AR

3    1256.)  The ALJ included the limitation that Plaintiff could only perform simple, repetitive tasks

4    in the hypothetical presented to the VE.  (AR 53.)  Based upon this and Plaintiff's physical

5    limitations, the VE found that Plaintiff would be able to perform unskilled, light and sedentary

6    work that is available in the economy, such as a cashier, theater usher, or ticket taker.  (AR 54.)

7    The ALJ is not bound to accept as true all restrictions presented by claimant's counsel in a

8    hypothetical.  Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995).  Plaintiff contends that the

9    ALJ erred by not accepting the hypothetical that was propounded to the VE by her attorney based

10   upon Dr. Aleshire's findings.  In this instance, the hypothetical that Plaintiff's counsel

11   propounded did not set forth Plaintiff's limitations and restrictions.  Rather, counsel asked the VE

12   to evaluate the raw medical data findings that Dr. Aleshire made and interpret those findings in

13   determining whether Plaintiff could perform any jobs available in the economy.  Interpreting the

14   medical findings is not the role of the VE during the hearing.

15   Finally, the ALJ is not required to consider or adopt the GAF score in making a disability

16   determination.  Morales v. Colvin, No. 8:12-cv-01740-OP, 2013 WL 2237964, at *5 (C.D. Cal.

17   May 21, 2013).  "The Social Security Administration has declined to endorse the GAF scale for

18   use in the Social Security and [Social Security Insurance] disability programs, and has indicated

19   that GAF scores have no direct correlation to the severity requirements in the mental disorders

20   listings."  Thomas v. Astrue, No. 2:07-cv-08040, 2009 WL 151488 (C.D. Cal. Jan. 21, 2009)

21   (internal punctuation omitted) (quoting Revised Medical Criteria for Evaluating Mental Disorders

22   and Traumatic Brain Injury, 65 Fed.Reg. § 50746–01 (Aug. 21, 2000)).  Further, the ALJ and the

23   VE both noted that the GAF score was inconsistent with Dr. Aleshire's finding that Plaintiff was

24   able to perform one to two step simple and repetitive tasks.  Where the evidence is susceptible to

25   more than one rational interpretation, the court must uphold the findings of the ALJ where they

26   are supported by inferences reasonably drawn from the record.  Molina, 674 F.3d at 1111.

27   The ALJ's stated limitations regarding Plaintiff's mental health are supported by

28   substantial evidence in the record.  Here, the ALJ did not err in failing to adopt the VE testimony

1   based upon Plaintiff's hypothetical which listed the medical findings of Dr. Aleshire.

2       **C.      Whether the ALJ Erred in Failing to Find Plaintiff Credible**

3       Finally, Plaintiff contends that the ALJ erred by failing to find Plaintiff credible because

4   the treatment records support Plaintiff's complaints, and there is no clear and convincing

5   evidence that she is not credible.  (ECF No. 15 at 16-19.)  Defendant argues that the ALJ

6   provided valid reasons to find that Plaintiff was not fully credible.  Plaintiff's statements

7   regarding why she stopped working in 2003, her activities, and response to treatment, as well as

8   the gaps in treatment, were considered by the ALJ in making the credibility determination.  (ECF

9   No. 16 at 12.)

10      Determining whether a claimant's testimony regarding subjective pain or symptoms is

11  credible, requires the ALJ to engage in a two-step analysis.  Molina, 674 F.3d at 1112 (9th Cir.

12  2012).  The ALJ must first determine if "the claimant has presented objective medical evidence of

13  an underlying impairment which could reasonably be expected to produce the pain or other

14  symptoms alleged."   Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal

15  punctuation and citation omitted).  This does not require the claimant to show that her impairment

16  could be expected to cause the severity of the symptoms that are alleged, but only that it

17  reasonably could have caused some degree of symptoms.  Smolen, 80 F.3d at 1282.

18      Second, if the first test is met and there is no evidence of malingering, the ALJ can only

19  reject the claimant's testimony regarding the severity of her symptoms by offering "clear and

20  convincing reasons" for the adverse credibility finding.  Carmickle v. Commissioner of Social

21  Security, 533 F.3d 1155, 1160 (9th Cir. 2008).  The ALJ must specifically make findings that

22  support this conclusion and the findings must be sufficiently specific to allow a reviewing court to

23  conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily

24  discredit the claimant's testimony.  Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004) (internal

25  punctuation and citations omitted).

26      The ALJ found that Plaintiff's mental impairments are severe, (AR 19), and that her

27  medically-determinable impairments can reasonably be expected to produce her alleged

28  symptoms, but her statements regarding the intensity, persistence, and limiting effects of her

1   symptoms are not credible, (AR 20.)  The ALJ found Plaintiff not to be credible based upon her

2   statements regarding why she stopped working, her assistance in her father's recovery, attempts

3   to obtain unemployment, and statements regarding moving in with her daughter.  (AR 20.)

4          In the disability report completed by Plaintiff, she stated that she stopped working on June

5   15, 2003, because she was unable to keep up with job duties and unable to stay focused.  (AR

6   224.)  However, at the hearing on April 14, 2010, Plaintiff testified that she was terminated from

7   her last employment and was told the termination was due to a dirty drug test.  (AR 38.)  In her

8   intake assessment with Mr. Shurson on May 30, 2006, Plaintiff stated that she was fired from her

9   job for drug use after working for the company for ten years.  (AR 696.)  Plaintiff also stated that

10  she used methamphetamine on a daily basis in 2005, and had been clean for ten months.  (AR

11  695.)  At the hearing on April 14, 2010, Plaintiff stated she has been clean and sober from the

12  use of drugs and alcohol for five years.  (AR 38-39.)  However, during her examination with Dr.

13  Aleshire on May 16, 2010, Plaintiff stated she had been arrested and convicted for a DUI and had

14  been drinking almost daily to the point that she became drunk for the past several months.  (AR

15  1254.)  The ALJ properly considered Plaintiff's inconsistent statements regarding her termination

16  and her alcohol use in determining her credibility.  Tommasetti v. Astrue, 533 F.3d 1035, 1039

17  (9th Cir. 2008)

18         The ALJ also considered Plaintiff's attempts to obtain unemployment benefits.  In the

19  April 27, 2007, notes written by Nurse Practitioner Glaze, Plaintiff stated that she was attempting

20  to get disability benefits, (AR 853), and on July 1, 2010, Plaintiff informed Dr. Villa that she had

21  applied for and been approved to receive unemployment benefits.  (AR 1260.)  While Plaintiff

22  alleges that she is unable to perform any work, to be eligible for unemployment benefits in

23  California a claimant must establish both her ability to work and availability to work during that

24  week.   Calif. Unemp. Ins. Code § 1253(c);  Gunn v. Employment Development Dep't, 94

25  Cal.App.3d 658, 664 (1979).    While receipt of unemployment benefits can undermine a

26  claimant's alleged inability to work fulltime, Carmickle, 553 F.3d at 1162-63, in California an

27  individual can receive unemployment benefits if they are available for part-time work, Cal.

28  Unemp. Ins. Code § 1253.8.  In this instance, Plaintiff contends that her mental health issues

make her unable to perform any work.  While the record does not reflect whether Plaintiff's unemployment benefits are based on part-time or fulltime availability for employment, Plaintiff is alleging that she is unable to work at all and this is a factor that the ALJ properly considered in determining her credibility.

Plaintiff alleges that she has been unable to perform any work or do anything due to her mental health issues, however, during an interview on May 10, 2006, Plaintiff stated that she had recently been employed as a housekeeper but had to quit due to her severe anemia.  (AR 696.) On April 12, 2007, Plaintiff stated that her father was home after suffering a stroke and she was assisting in his recovery and rehabilitation.  (AR 1180, 1183.)  On May 1, 2007, Plaintiff stated she and her father were making an effort to be more active and were enjoying each other's company more when they were out of the house.  (AR 1178.)  On May 20, 2010, Plaintiff also expressed concern that moving in with her daughter would cause her to become a live-in nanny for her granddaughter.  (AR 1266.)  In her examination with Dr. Aleshire on November 30, 2010, Plaintiff stated that she worked for several months as a caregiver about five years prior, but had to stop due to health problems.  (AR 1253.)  Further, the record indicates that on November 30, 2010, Plaintiff was assisting with caring for her father at home and was a Narcotics Anonymous sponsor.  (AR 1145.)  An ALJ may consider a claimant's activities in determining credibility. Lingenfelter, at 1040; Thomas, 278 F.3d at 958.

Since it was appropriate to consider all the factors the ALJ relied on in making his credibility finding, substantial evidence in the record supports the ALJ determination that Plaintiff was not credible.

## V.

## CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ did not err in failing to adopt the opinion of the treating source, Ryan Shurson, MFT at Mental Health; in failing to accept and adopt the VE testimony in Dr. Aleshire's assessment; and in finding that Plaintiff was not credible.  Accordingly,

IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the

1    Commissioner of Social Security is DENIED.  It is FURTHER ORDERED that judgment be

2    entered in favor of Defendant Commissioner of Social Security and against Plaintiff Barbara

3    Jean Campbell.  The Clerk of the Court is directed to CLOSE this action.

IT IS SO ORDERED.


Dated:    **September 6, 2013**                        _____

                                                       UNITED STATES MAGISTRATE JUDGE

31